UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JOHN DOE,<br><br>               Plaintiff,<br><br>     v.<br><br>CORPORATION OF THE CATHOLIC BISHOP OF YAKIMA, a Washington nonprofit corporation, DIOCESE OF YAKIMA, and CATHOLIC CHURCH OF THE RESURRECTION,<br><br>               Defendants. | No.  CV-11-3073-EFS<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |

## I.   INTRODUCTION

During the last two decades, Dioceses and Parishes of the Catholic Church in different states have been repeatedly sued because Bishops and others in authority sent priests known to have molested children to new assignments where they molested other children.  This is not such a case.

On July 29, 1999, Deacon Aaron Ramirez, an adult, while in Zillah, Washington, on his days off from church responsibilities, and more than one hundred miles from his assignment at a church in Wenatchee, Washington, committed a crime under Washington law by sexually abusing John Doe, then seventeen and a half years old, a foster son in a family with whom Ramirez had a friendly relationship

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 1

1    and was visiting.   The crime occurred after a night of heavy drinking

2    in a trailer owned by the Catholic Church of the Resurrection

3    ("Resurrection") or Corporation of the Catholic Bishop of Yakima

4    ("Diocese") where Ramirez had once served.   Ramirez was not in Zillah

5    on any church-related business or assignment, nor had he the

6    permission of the Resurrection pastor to use the trailer.   John Doe

7    was not in the company of Ramirez for any church activity nor any

8    activity approved by, encouraged by, or sponsored by either the

9    Diocese or Resurrection.   On July 29, 1999, neither the Diocese nor

10   Resurrection had any knowledge of any prior misbehavior, or any prior

11   inappropriate sexual behavior by Ramirez, nor any reason to know that

12   he posed a risk of such behavior.   In 2011, John Doe sued the Yakima

13   Diocese and the Resurrection Parish alleging they were negligent,

14   negligent in supervising Ramirez, and negligently inflicted emotion

15   distress upon him.   For the pain, suffering, and emotional distress

16   caused by the crime for which he claims Defendants are liable under

17   several theories, Plaintiff asks for eight million dollars in damages.

18   From May 10, 2014, to March 20, 2014, the case was tried to the Court

19   sitting as trier of fact.   On April 21, 2014, the parties addressed

20   motions under Federal Rule of Civil Procedure Rule 52(c) by which

21   Defendants asked the Court to dismiss the case because Plaintiff had

22   failed to prove the elements of each of his claims, and then the

23   parties made final arguments to the Court.

24        Because the Plaintiff was a resident of Oregon at the time this

25   case was filed in federal court, in Yakima, against Defendants,

26   Washington residents, the Court has diversity jurisdiction per 28

U.S.C. § 1391 and therefore applies the law of the State of Washington. *See Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.").

After carefully listening to all of the testimony, judging the credibility of the witnesses, examining the admissible exhibits both when admitted and during the writing of this decision, listening to the arguments of skillful counsel for the parties, reviewing their memoranda and individually proposed Findings of Fact and Conclusions of Law, and based on the Court's Findings of Fact and Conclusions of Law, and Order which follow in considerable detail, the Court:

- denies Defendants' Motion to Dismiss based on the expiration of the statute of limitations,

- denies Plaintiff's oral motion for a spoliation inference,

- grants Defendants' Motion to Dismiss Plaintiff's claim of negligent infliction of emotional distress for Defendants' post-July 29, 1999 conduct,

- grants Defendants' Motion to Dismiss Plaintiff's claims of negligence and negligent supervision,

- alternatively, finds Plaintiff failed to prove his claims against Defendants, and

- directs Judgment be entered in Defendants' favor.

## II.  **PROCEDURAL HISTORY**

On July 8, 2011, Plaintiff filed this suit against Defendants, in which he asserted claims of negligence, negligent infliction of emotional distress ("NIED"), and outrage. On December 10, 2012,

1    Defendants moved for summary judgment, seeking dismissal of all
2    claims.    In response, Plaintiff withdrew his outrage claim.    On July
3    30, 2013, the Court denied summary judgment on Plaintiff's negligence
4    and NIED claims.

5        This matter came before the Court for bench trial on March 10-13
6    and March 18-20, 2014, and April 21, 2014.    Bryan G. Smith, Vito R. de
7    la Cruz, and Megan E. Hale appeared for Plaintiff John Doe.    Thomas
8    Frey and Ted Buck appeared for Defendant Corporation of the Catholic
9    Bishop of Yakima, Dioceses of Yakima, and Catholic Church of the
10    Resurrection (collectively, "Defendants").

11        The following witnesses testified in open court: Msgr. John
12    Ecker, Rev. Thomas Kuykendall, Father William Shaw, Rev. Robert Siler,
13    Plaintiff John Doe, Darrel White, Bishop Carlos Sevilla, Nansi Lopez,
14    Richard Sipe, Dr. Randall Green, Dr. Russell Vandenbelt, Francisco
15    Maltos, David Simmons, Annette Olson, and Juan Godina.    The parties
16    additionally submitted the video deposition testimony of Rigoberto
17    Lopez.    *See* Plaintiff's Exhibit 16 (video) & 16A (certified
18    transcript).    The Court received into evidence the following trial
19    exhibits: Plaintiff's Exhibits 1, 2 (Plaintiff's bates 89-91; 268-308
20    only), 7, 8, 10A, 11, 14, 15, 15A, 15B, 16, 16A, and 17, and
21    Defendants' Exhibits 500-507.

22        After Plaintiff rested, Defendants filed a Motion for Judgment
23    on Partial Findings under Rule 52(c).    ECF No. 131.    This procedure is
24    available in bench trials.    The Court allowed Plaintiff an opportunity
25    to file a response.    Defendants then filed an Amended Motion for
26    Judgment on Partial Findings, ECF No. 136, to which Plaintiff

1   responded, ECF Nos. 140 & 141, and Defendants filed a reply, ECF No.

2   142.  However, the Court continued to hear evidence in the Defendants'

3   case.  Plaintiff and Defendants filed Amended Findings of Fact and

4   Conclusion of Law, ECF Nos. 138 & 137.  As permitted in Rule 52(c),

5   the Court, by permitting these filings, as a practical matter declined

6   to enter any judgment until the close of the evidence.

7                          III.  **FINDINGS OF FACTS**

8          The Court now makes each of the following findings of fact based

9   on a preponderance of the evidence unless explicitly stated otherwise

10  in a specific finding of fact:

11         1.    On Thursday, July 29, 1999, Aaron Ramirez (Ramirez) was a

12               Deacon in the Corporation of the Catholic Bishop of Yakima

13               (Diocese) in Yakima County, assigned to St. Peter's Church

14               in Chelan County, Wenatchee, Washington.  He had been so

15               assigned since the month of June where he assisted Fr.

16               Kuykendall, the Pastor there.  As of that date, Ramirez had

17               satisfactorily performed all of his duties as a Deacon and

18               as a seminarian since his arrival in the Diocese in 1998.

19         2.    On that date, Ramirez advised Fr. Kuykendall that he was

20               taking his scheduled two-day time off and was going to

21               Zillah.  Though he had been assigned to assist Fr. Shaw at

22               the Catholic Church of the Resurrection in the Diocese

23               (Resurrection) in Zillah, Washington, as a seminarian,

24               after his assignment as a Deacon to St. Peter's in

25               Wenatchee, in June, he had no responsibilities at

26               Resurrection Parish and certainly none on July 29, 1999.

On July 30 in a telephone conversation with Bishop Sevilla
who told him there had been a complaint of sexual abuse by
him that the Zillah police were investigating, Ramirez
claimed that he had been at Zillah for a Charismatic
Service.   Fr. Shaw testified that there had not been a
Charismatic Service on July 29 because none was scheduled.
Typically, if there had been a Charismatic Service, it
would have been on the Resurrection calendar and Fr. Shaw
as pastor would have approved it and known about it.   On
July 29, there was no Charismatic Service at Resurrection
or any other church event or church related or church
sponsored event or meeting at Resurrection in which either
Ramirez or John Doe participated.   Ramirez was on his days
off.   On July 29, Fr. Shaw was out of town.

3.   The Diocese did pay Ramirez a salary, living expenses, and
provided him housing at his assigned location, but did not
supply Ramirez with a vehicle.   Ramirez had no vehicle and
depended on others to transport him from place to place.
Unidentified friends picked him up in Wenatchee.   It is
unknown whether those same friends returned him to
Wenatchee on July 30 or transported him from Wenatchee on
or about July 31.   There is no evidence that the Diocese or
Resurrection was in any way involved in his travel from
Wenatchee to Zillah and back, or in his travel to Mexico
from Wenatchee in the days following July 29.

//

4.  Later in afternoon or early evening of July 29, he visited the Lopez family.  Ramirez had visited the Lopez home on occasion in the past.  He had befriended them during his early assignment as a seminarian to assist Fr. Shaw.  Mr. Lopez, a member of the Resurrection Parish Council, helped in a number of ways at the Church and had keys to the Resurrection facilities.

5.  At some point, Rigoberto, one of John Doe's foster brothers, then fourteen years old, asked his mother for permission to go over to the trailer on the Resurrection grounds with Ramirez.  Mrs. Lopez allowed him to go.  Mrs. Lopez worked the night shift but there is no evidence whether she worked that night.  The two of them walked two miles, or so, from the Lopez home to the trailer and met some other young teens.  Beer was consumed and some wine.  Rigoberto had been to the trailer on another occasion some months earlier with other teens and Ramirez when there was drinking.  None of the Diocese or Resurrection Church personnel knew of this.  On July 29, Rigoberto felt a "buzz" and after the other teens left, decided to sleep over.  At some point when he was in bed with Ramirez he became uncomfortable because he could feel Ramirez had an erection against his back.  He told Ramirez that he wanted to leave and Ramirez walked him back to the Lopez home.  While he felt a heightened sense of things walking home, Rigoberto did not believe he had been drugged.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 7

6.    Prior to the evening of July 29, Ramirez had never acted inappropriately with Rigoberto or any other teen that Rigoberto observed.   He did not believe that he was sexually abused by Ramirez that night

7.    After arriving home with Ramirez, Rigoberto heard John Doe, then seventeen-and-a-half-years old, and Ramirez, in his early thirties, decide to walk back to the trailer to play guitar.  It was late when they left.  John Doe had never been to that trailer before.  John Doe had never heard that anyone at the Diocese or Resurrection were aware that Ramirez had been at his foster home when there was a teenage drinking party, or that he had been drinking with teens.  As the time of trial, Rigoberto had never been told by John Doe what had happened in the trailer.

8.    John Doe was not raised as a Catholic and was generally skeptical about the Catholic faith.   After joining his foster family in Zillah sometime in the late spring of 1998, he would occasionally assist his foster father with chores at the church, was not a member of any Resurrection youth group, or any church sponsored or supported group. On July 29, his decision to accompany Ramirez to the trailer late at night was not related in any way to any Church activities.   No Church official in either the Diocese, Resurrection, or St. Peter's in Wenatchee, was aware of the fact that Ramirez had a key to that trailer or was using it that night.

9.    John Doe had a horrific early childhood.  About age five, he reports that he was repeatedly sexually abused by a friend of his completely dysfunctional family.  His parents severely neglected him and his five siblings.  Their mother abandoned them in a public park after which they became dependents of the state and were placed in foster care in 1995.  That placement ended in the spring of 1998 due to allegations that his sisters were being sexually abused in that setting by one of the foster parents.  This was emotionally upsetting for all of those children.  Earlier in that placement at about age 11, John Doe began inappropriately touching his sisters which caused concern, and counseling was begun during which he revealed that he had been sexual abused at about age five.  Counseling was successful.  That inappropriate conduct was not repeated.

10.    At the trailer on the night of July 29, John Doe was a seventeen-and-a-half-years old talented athlete about to enter his senior year in high school.  He did not drink, but that night he drank beer and liquor, and wine provided by Ramirez which was taken from the Resurrection Church.  Ramirez was in his early thirties.  They were physically about the same size.  John Doe remembers that he could not seem to catch his breath and went out on the porch where he asked Ramirez for help.  John Doe then blacked out and when he awoke in the morning, he was naked in bed with Ramirez.  He went out to a couch in the trailer.  Ramirez followed

and wrapped his arms and legs around John Doe.  They then walked back to the Lopez home.  John Doe climbed out of the back window of the Lopez home and called his trusted counselor at Casey Family Services and told him he thought something serious had happened.  The counselor went to John Doe's location to counsel with him.  John Doe told him that at some point after drinking, he passed out and did not remember anything that happened but woke up in bed without any clothes on with Ramirez in the same bed.  John Doe also told the counselor that he felt "filthy," and the fact that he did not know exactly what had happened after he passed out bothered him.

11.  The counselor took him to the Zillah Police Department and then to the hospital.  Pursuant to a document retention policy of the hospital, the records of that examination and all chart notes had been destroyed before the lawsuit was filed in 2011.  However, the counselor remembers that the examination at the hospital did not show any signs of physical sexual trauma though the counselor pointed out scratch on his right hip and some on his arms.  The police records differ.  They document that no exam was done because John Doe denied anything had happened. Accordingly, there is no documentary evidence that John Doe suffered physical sexual trauma or that he complained of any physical pain.  This does not alter the nature of Ramirez's conduct as he admitted to Bishop Sevilla that he

had engaged in sexual contact with John Doe, a minor. Both Bishop Sevilla, and other Diocesan priests, communicated to others, including the Vatican, during the successful effort to laicize Ramirez that Ramirez had admitted to sexually abusing John Doe. Sexual abuse of a minor was, and is, a crime under the laws of the State of Washington. At trial, John Doe had no memory of what he told police and little memory of what occurred at the hospital.

12.    Both the counselor and the Zillah Police Chief testified that the hospital had taken swabs and blood work from John Doe to test for drugs and possible disease. There is no record of the results of those tests or any reference to the results in the police investigative file. There is no evidence that the Zillah Police Department did a forensic examination of the trailer.

13.    The police investigation was halted because John Doe who denied anything had happened appeared to the police to be too emotional to provide any details. The police were ready to continue the investigation when John Doe was ready to be interviewed and provide details. John Doe decided to try to move on with his life and did not contact the police to arrange for that interview. Consequently, no formal criminal charge was ever filed against Ramirez.

14.    During his deposition in this case, taken after the case was filed in 2011, John Doe for the first time gave a description of being repeatedly raped by Ramirez during the

1    night before he passed out again.   He repeated that
2    description at trial.

3    15.  When Bishop Sevilla learned of the police investigation of
4        Ramirez for sexual abuse of John Doe, he called Ramirez at
5        St. Peter's in Wenatchee.   The Bishop told Fr. Kuykendall
6        that there was an investigation of molestation by Ramirez.
7        He then talked to Ramirez who admitted sexual conduct with
8        John Doe and offered that he had been at Resurrection for a
9        Charismatic Service which proved to be a lie.   The Bishop
10       told Ramirez that he had assigned Fr. Metha to travel to
11       Wenatchee the next morning to pick up Ramirez and return to
12       Zillah with him to deal with the sexual abuse
13       investigation.   Upon his arrival in Wenatchee, Fr. Metha
14       found that Ramirez had departed.   Police records reflect
15       that upon his arrival, Fr. Metha found a note from Ramirez
16       that he had gone to Texas and would return Monday.   The
17       note itself was not seen by others and was not in the files
18       of the Diocese.

19   16.  The Diocese offered counseling to John Doe who declined
20       through the foster family.

21   17.  The Diocese cooperated with the police investigation.

22   18.  John Doe, though coping with emotional reactions, including
23       reported cutting of himself, had a relatively successful
24       senior year in high school.

25   19.  In November 1999, or thereabout, he and his foster sister,
26       Nansi, also a senior in high school, were intimate with the

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 12

result that she became pregnant.  A baby was born to the couple in the summer of 2000.

20.  John Doe entered the United States Marine Corps but did not complete basic training.

21.  He and Nansi lived together with their child in Portland, and then moved back to the Yakima Valley.  During that time, John Doe began to drink heavily on occasion.  He would black out, run to distant locations, remember nothing, and Nansi would drive to those locations to bring him back to their home.  They later returned to Portland, Oregon.

22.  John Doe did not counsel with anyone during this time.

23.  John Doe was able to obtain and keep full time employment in the years that followed.  He continued to drink heavily, principally on weekends, when he would black out, run, and remember nothing.

24.  He eventually was cited for two driving while under the influence citations (DUIs).  John Doe began some counseling.  His behavior when drinking was of grave concern to Nansi, their son, and the family because he was endangering himself.  Though John Doe reported several instances where he tried to commit suicide, he never was injured to the point of requiring medical care or hospitalization.

25.  Dr. Green, a qualified expert on the psychological trauma suffered by victims of childhood sexual abuse, administered

psychological tests, conducted lengthy and comprehensive interviews with John Doe and Nansi, and diagnosed him as having Post Traumatic Stress Disorder (PTSD) and severe depression, among other conditions.

26. Based on his interviews, testing, review of records, and extensive experience in counseling with victims of sexual abuse, Dr. Green opined that it was not until John Doe entered into mandatory counseling for his DUI in Oregon in 2011 that he began to make a connection between his drinking induced harmful behavior and the criminal sexual abuse by Ramirez. Defendants offered no expert testimony opposing this opinion. The Court finds Dr. Green credible, and that this opinion regarding the time when John Doe made the connection between his behavioral and mental health issues is well-founded given his testimony and the testimony of John Doe, Nansi, and Rigoberto. As John Doe filed this lawsuit within a year of discovering this connection, it was filed within the limitations period of RCW 4.16.340(c).

27. In 1998, Ramirez had satisfactorily completed seminary in Mexico. Upon his application that same year, and full compliance with its procedures, the Diocese had arranged for him to come to the United States and enter seminary in Toppenish. There was no evidence of any form of sexual misbehavior or inappropriate sexual conduct while Ramirez attended seminary either in Mexico or in the United States.

28.  Diocesan policies for those who wished to become priest candidates required the Diocese to obtain and review seminary educational records of those candidates, as well as, recommendations from that seminary.  The standard of care required this to ensure that such candidates were capable and ready to fulfill the duties of a priest, and that their record did not demonstrate a risk to parishioners including children and the youth of the Diocese, as several witnesses, including Mr. Sipe, testified.  Both Bishop Sevilla and Monsignor Ecker, the vocational director in the Diocese at the relevant time, agreed that the Diocese only accepted candidates upon receipt of the required supporting documentation.  There is no evidence that Diocese had ever made an exception to this policy for any other candidate and no evidence that it actually did so for Ramirez.

29.  In January 2000, Bishop Sevilla wrote a note to Fr. Ecker requesting his assistance in locating the Ramirez file, stating he had searched for it and it was not in the Chancery safe, nor in his possession, nor the possession of others he had contacted, including the attorney for the Diocese.  The Diocese searched for that file but could not find it.  Both Bishop Sevilla and Monsignor Eckert testified that they would have reviewed the documents supporting Ramirez's application as it was their standard practice to do so and that Ramirez would have been accepted

only if the documents did support his candidacy. Because that missing file became relevant when John Doe filed his lawsuit approximately eleven years after July 29, 1999, the Court carefully observed the manner, facial expressions, tone, and choice of language used by both Bishop Sevilla and Monsignor Eckert while testifying, particularly about their standard practice of obtaining and reviewing documents about priest candidates and that they must have done so in regard to Ramirez's application. Based on this careful observation, they were both credible that the file must have once existed, that they would have reviewed its contents, and would only have accepted Ramirez because the documentation supported his application. Additional findings on their credibility will be made with regard to Plaintiff's request in rebuttal closing that because the file is missing, the Court apply the spoliation inference and make adverse inferences about the contents of that file or that there never was a file. For reasons to be stated therein, the Court declines to apply the spoliation inference because it finds that the Diocese did not willfully, intentionally, or in bad faith destroy or hide the Ramirez file which at some time prior to July 29, 1999, existed.

30. There was evidence that in the 1990s the Diocese gave general psychological exams to candidates for seminary. For example, Father Siler testified that he took one in

1995 to enter the seminary. This was a general psychological exam to establish whether an applicant for the seminary had a psychological profile supporting the assumption of responsibilities of a priest. That exam was not required of an applicant who had already been in a seminary as it was customary to administer the exam before admission to the seminary. Bishop Sevilla, per his communications with Ramirez, believed that Ramirez had taken one before admission to the seminary in Mexico. In response to Fr. Siler's request when attempting to reconstruct the file after this lawsuit was filed, the seminary sent its records of Ramirez demonstrating his successful completion of seminary education. No other documents were sent.

31. During his time at the seminary in Mexico, Ramirez was dropped by the Hijos Order (Hijos) and accepted by the Oratorio Order (Oratorio). In response to an inquiry by Fr. Siler in 2011 for records of Ramirez, Hijos responded that Ramirez had been dropped from Hijos, Hijos would have given a negative response to any inquiry about Ramirez, and no inquiry from the Diocese was in its file. Oratorio did not respond to a similar inquiry by Fr. Siler. The records of the seminary in Mexico show that Ramirez continued his studies at seminary without interruption when he transitioned from Hijos to Oratorio. The Court finds it certain that Oratorio would have inquired of Hijos the

reasons for its action and would only have accepted Ramirez upon receiving a response which would not disqualify Ramirez as a member of Oratorio.  There are many possible reasons for the action by Hijos; one might be sexual misconduct, but the Court finds it likely that Oratorio would not have accepted Ramirez had such information been communicated by Hijos to Oratorio.  The Court find there is no evidence, nor reasonable inference from any evidence, that Ramirez had engaged in any kind of sexual misconduct while a member of Hijos.  The Court finds that there is no evidence, nor reasonable inference from any evidence, that the seminary would have allowed Ramirez to continue his studies to become a priest if it knew, or had reason to know, of any sexual misconduct by Ramirez, let alone sexual abuse of minors.  Plaintiff argues that the missing file and the non-specific negative reference in the Hijos file is enough to create a reasonable inference that Ramirez must have posed a risk of sexual misconduct.  That is one possibility, but the Court finds on the basis of all of the evidence and findings made that there is just no evidence, or reasonable inference from the evidence, that Ramirez did pose such a risk, and further finds that neither the Diocese nor Resurrection had any reason to suspect that he did pose such a risk.

32.  The Court admitted correspondence between Bishop Sevilla and Ramirez after Ramirez fled to Mexico.  Given the

missing file, this evidence was admitted because it had the potential to reveal Diocesan knowledge of Ramirez' conduct while in seminary in Mexico, during his admission to seminary in Toppenish, and while a Deacon, as well as, the details of his conduct on July 29, 1999. Plaintiff argues that the correspondence reveals the Bishop's lax attitude toward the crime and Ramirez, an admitted criminal, and therefore gives rise to an inference that the Diocese did not care about the risk Ramirez posed. The Court finds that Bishop Sevilla was both managing the removal of Ramirez as a Deacon while coaxing him to realize he would not be accepted as a Catholic priest in Mexico. And, while perhaps difficult for a lay person to understand, the Bishop was indeed ministering to a sinner within his priestly duties. Such ministrations have been the subject of movies, books, and novels. Given a careful review of that correspondence and the testimony of Bishop Sevilla, the Court finds nothing therein which supports the view advanced by Plaintiff that the Diocese had a duty to John Doe or that it breached any arguable duty to John Doe.

//

//

//

//

//

/

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 19

IV.   **LEGAL ANALYSIS AND CONCLUSIONS OF LAW**

In this section of the decision discussing the bases for its conclusions of law, the Court also makes findings of fact in addition to those above.

**A.    Plaintiff's Oral Motion for Spoliation Inference**

Plaintiff John Doe requests an adverse inference from the fact that the file of Ramirez was not found when Defendants searched for it in 2000.

In Rebuttal Closing Argument, Plaintiff for the first time argued that the Court should apply an adverse inference regarding the file of Ramirez that was found missing in early 2000, several months after the July 29, 1999 incident forming the basis of Plaintiff's claim.

The Court already found that Defendants did discover that the Ramirez file was missing in early 2000 and that there was then no case pending nor was there any indication that a civil lawsuit might be filed.  Indeed, Plaintiff did not file this lawsuit until more than eleven years after the incident.  Defendants' efforts to locate the file are documented in the record.  Because Ramirez' file was now relevant to this case yet found missing years ago, the Court closely observed the tone, manner, and language of Defendants' witnesses while testifying about the discovery that the Ramirez file was missing and their efforts to locate it.  The Court finds them credible that the file did exist, and is simply missing, and was not, either intentionally or in bad faith, destroyed or hidden.  There is nothing in the record to support a finding that any of Defendants' priests,

deacons, or employees intentionally or in bad faith destroyed or hid the Ramirez file.  Further, there is nothing in the record to support a reasonable inference either from the fact that the file was found missing in 2000 or when that fact is combined with the evidence of the contemporaneous actions of Defendants' priests, deacons, or employees that leads to a reasonable inference that the file was intentionally or in bad faith destroyed or hidden.  To the contrary, the Court finds that Defendants cooperated with law enforcement investigating the incident at the time of that investigation, a fact inconsistent with destruction of evidence.  There is also no evidence that after Plaintiff filed this lawsuit, Defendants engaged in any destruction of evidence or asserted that any relevant documents were missing.  Again to the contrary, Defendants produced documents in the form of a series of e-mails between Bishop Sevilla and Ramirez from over a period of years, beginning as early as August 11, 1999, less than two weeks after the incident, and spanning over several years, communications Plaintiff has criticized, as well as e-mails to a seminary and two religious orders in Mexico, in an attempt to reconstruct the file pertaining to Ramirez.  And there is no evidence, or any reasonable inference from any evidence, in the case that before July 29, 1999, Ramirez ever engaged in inappropriate behavior of the type that he admitted to, or as alleged by Plaintiff, nor any conduct that would cause concerns that he would engage in such behavior.  Finally, the record contains no evidence that Defendants' priests, deacons, or employees have in the past negligently, intentionally, or in bad faith destroyed records relevant to investigations regarding actual or even

1    alleged sexual abuse by priests, deacons, or lay personnel of

2    Defendants, which, if proven, might lead to an inference that the

3    Ramirez file was intentionally or in bad faith destroyed or hidden.

4         A court sitting as trier of fact may draw an adverse inference

5    when a party destroys relevant evidence. *Welsh v. United States,* 844

6    F.2d 1239, 1246 (6th Cir. 1988).

7         The adverse inference is based on two rationales, one
         evidentiary and one not.  The evidentiary rationale is

8         nothing more than the common sense observation that a party
         who has notice that a document is relevant to litigation

9         and who proceeds to destroy the document is more likely to
         have been threatened by the document than is a party in the

10        same position who does not destroy the document. . .

11        The other rationale for the inference has to do with its
         prophylactic and punitive effects.  Allowing the trier of

12        fact to draw the inference presumably deters parties from
         destroying relevant evidence before it can be introduced at

13        trial.

14   *Nation-wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214,

15   218 (1st Cir. 1982)

16        Here the Court finds that Defendants have not engaged in

17   willful, intentional, or bad faith conduct to destroy or hide the

18   Ramirez file.  Though Defendants may have been negligent in some way

19   resulting in the fact that the file was, and is, missing, there is no

20   evidence that Defendants were negligent, and there was no litigation

21   pending, threatened, or even considered, at the time the file was

22   found to be missing.

23        The Court, therefore, declines to draw an adverse inference that

24   1) the missing file contained direct evidence of the propensity of

25   Ramirez to engage in the behavior he admitted, was alleged to have

26   committed, or any conduct from which such conduct could have

1    reasonably been anticipated, 2) there was no actual file, as at least

2    a couple of Defendants' witnesses creditably testified to having seen

3    the file and actually wrote letters based on their review of the file,

4    or 3) the content of the file partially or wholly did not support the

5    admission of Ramirez to the seminary or as a Deacon.

6    **B.    Statute of Limitations**

7        Defendants ask the Court to grant a Rule 52(c) dismissal of the

8    entire case because John Doe did not file it within the applicable

9    statute of limitations in the State of Washington.   John Doe responds

10   that he did not connect his injury and damages to the sexual assault

11   of July 29, 1999, until 2010 and filed this lawsuit within three years

12   of that time.   Defendants have the burden of proof that the statute of

13   limitations expired before John Doe filed this lawsuit in 2011.   *See*

14   *Korst v. McMahon,* 136 Wn. App. 202, 208 (2006).

15       Pursuant to RCW 4.16.340, "Actions based on childhood sexual

16   abuse,"

17       (1) All claims or causes of action based on intentional
         conduct brought by any person for recovery of damages for
18       injury suffered as a result of childhood sexual abuse shall
         be commence within the later of the following periods:
19           (a) Within three years of the act alleged to have
             caused the injury or condition;
20           (b) Within three years of the time the victim
             discovered or reasonable should have discovered that
21           the injury of condition was caused by said act; or
             (c) Within three years of the time the victim
22           discovered that the act caused the injury for which
             the claim is brought:
23       PROVIDED, That the time for commencement of an action under
         this section is tolled for a child until the child reaches
24       the age of eighteen years.
         . . . .
25       (4) For purposes of this section, "child" means a person
         under the age of eighteen years.
26

(5) As used in this section, "childhood sexual abuse" means any act committed by the defendant against a complainant who was less than eighteen years of age at the time of the act and which act would have been a violation of 9A.44 RCW or RCW 9.68A.050 or prior laws of similar effect at the time the act was committed.

RCW 4.16.340.  It is undisputed that John Doe was a "child"; he was seventeen-and-a-half-years old on July 29, 1999.  It is also undisputed that the sexual abuse by Ramirez was a crime.  What is disputed is when John Doe "discovered that the act caused the injury for which the claim is brought."  RCW 4.16.340 (1)(c).

"Section (1)(c) . . . refers to the discovery of the causal connection between a known act and subsequent injuries including injuries that develop years later." *Hollman v. Corcoran*, 89 Wn. App. 323, 334 (1997).  The person subjected to the childhood sexual abuse must "in fact" make the connection between the injuries and the childhood sexual abuse.  *Id*.  In *Hollman,* the plaintiff, having been sexually abused at an early age, was befriended in his early teens by the defendant, who sexually abused him over a period of years.  The plaintiff, like John Doe, knew of the acts of sexual abuse, had emotional reactions to the memory of them, drank to excess, married, had children, and as his children were born, had increased emotional reactions including suicidal ideation when recalling the sexual abuse.  He obtained counseling for his behavioral issues but it was not until much later in counseling after a diagnosis of Post-Traumatic Stress Disorder (PTSD) that he understood the connection between the sexual abuse and his psychological issues.  He then filed the lawsuit.  The Court of Appeals reversed the dismissal of the lawsuit concluding that

1  it was a question of fact for the jury to determine when plaintiff

2  made the connection between the sexual abuse and his injuries. *Id.* at

3  334.

4      In *Korst v. McMahon,* 136 Wn. App. 202 (2006), the trial court's

5  dismissal of the claims of childhood sexual abuse was reversed and

6  remanded for a new trial because there was insufficient evidence for

7  the trial court to find that the plaintiff had made the connection

8  between the early childhood sexual abuse by her father and her

9  psychological issues. This was the ruling despite years of letters

10 between the plaintiff and her father which explicitly stated the

11 sexual abuse and the plaintiff's anger. Plaintiff, her sisters, and

12 her therapist all testified that plaintiff did not make the connection

13 between her emotional and physical symptoms and the childhood sexual

14 abuse until she was in therapy years later when she was diagnosed with

15 PTSD resulting from the childhood sexual abuse. The content of the

16 letters to her father did not support the court's ruling that she had

17 in fact made the connection between the childhood sexual abuse and the

18 psychological issues. *But see Carollo v. Dahl,* 147 Wn. App. 796

19 (2010) (The Court of Appeal affirmed a dismissal of a RCW 4.16.340(c)

20 claim because the plaintiff, unlike the plaintiff in *Korst*, did not

21 testify that he did not connect the childhood sexual abuse to the

22 emotional issue until recent therapy. There the connection was known,

23 the symptoms increased later, but that increase did not change the

24 fact that the connection had earlier been made by the plaintiff.).

25     John Doe is much more like the plaintiffs in *Hollman* and *Korst*.

26 Like each of them, he did know an act of sexual abuse occurred and the

identity of the perpetrator.   Unlike those plaintiffs who suffered repeated childhood sexual abuse over a period of years, John Doe's abuse by Ramirez occurred on one occasion.   Like each of them, he experienced significant psychological issues.   And like them, he did not make the connection until he was in counseling for his continued drinking and behavior such as running into traffic while heavily intoxicated.   Like each of them, a therapist, Dr. Green, opined that John Doe did not make the connection between his episodic binge drinking and suicidal conduct until he was in therapy following his two DUIs.   Dr. Green's opinions on that issue are unrebutted.

The Court has found that John Doe did not connect the criminal sexual conduct of July 29, 1999, by Ramirez until 2010, the year before filing this lawsuit in 2011.   Accordingly, the Court concludes that Defendants have not carried their burden to establish that the statute of limitations expired before John Doe filed this lawsuit, denies Defendants' motion to dismiss under Rule 52(c), and concludes as a matter of law that John Doe filed his lawsuit within three years of the time of the discovery that the criminal sexual abuse by Ramirez caused his injuries in this lawsuit.

C.   **Negligence and Negligent Supervision**

"As a general rule, there is no duty to prevent a third party from intentionally harming another unless 'a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct.'"   *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 227 (1991) (citations omitted); *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 42 (1997).

A duty arises where:

(a) a special relation exists between the [defendant] and the third person which imposes a duty upon the [defendant] to control the third person's conduct, or
(b) a special relation exists between the [defendant] and the other which gives the other a right to protection.

*Id.* at 43 (quoting *Peterson v. State,* 100 Wn.2d 421, 426 (1983) (quoting Restatement (Second) of Torts § 315 (1965))).

Washington law recognizes that hospitals and group homes have a duty to protect their vulnerable residents from visitors, *Shepard v. Mielke*, 75 Wn. App. 201 (1994), from themselves, *Hunt v. King County*, 4 Wn. App. 14 (1971), and from staff, *Niece*, 131 Wn.2d at 42. Similarly, a church that has in its "care and custody" children engaged in church activities or church sponsored activities "has the same duty owed by a school or other institutions entrusted with the custody and care of vulnerable victims." *N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints*, 175 Wn. App. 517, 532 (2013) (explaining the holding in *C.J.C. v. Corp. of Catholic Bishop of Yakima*, 138 Wn.2d 699 (1999)).

In *N.K.*, a former boy scout brought an action against the named church and against both the Boy Scouts of America (BSA) and the local council of the BSA ("Council") for sexual abuse by a volunteer scout master who recently arrived in the local area and was a newly admitted member of the church. *N.K.,* 175 Wn. App. at 522. There the facts demonstrated that the church encouraged the children members to engage in scouting activities, provided a meeting place for the scout meetings, paid for their participation in the troop, and selected those who act as scoutmasters and adult volunteers. *Id.* at 522-24.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 27

Plus, the church owned a cabin where scouting activities took place. *Id.* *N.K.* held that because of the involvement of the church in so many ways in the scouting activities, "the church had a protective relationship with young NK that, under *McLeod* and *Niece*, gave rise to a duty to protect him from foreseeable harm." *Id.* at 534. However, it then held that there was no such custodial relationship between the plaintiff and the BSA and Council that would give rise to a duty. *Id.*

On the issue of whether there was a special relation between the entity and the adult abuser who was a volunteer in the scouting program which gave rise to a duty of care on the part of the Church, the Court said:

> In addition to the special protective relationship theory, NK alleges that all defendants owed him a duty because they had a special relationship with Hall which imposed upon them a duty to control Hall's conduct. *See Niece,* 131 Wash.2d at 43, 929 P.2d 420, citing RESTATEMENT (SECOND) OF TORTS § 315(a). This duty **does** depend on proof that the defendant was aware of the tortfeasor's dangerous propensities.

*Id.* at 535 (emphasis added). Because the BSA and the Council did not have any knowledge of the existence of the adult abuser volunteer, they did not have a special duty to NK. *Id.* But as to the church, the Court said it can be liable "when it allows its youthful members to be supervised by a person known to have a history of sexual misconduct." *Id.* at 536 (citations omitted). In *N.K.*, because there was conflicting evidence in the record as to the church's knowledge, the court held it was a matter for the jury to decide. *Id.* at 537. *In accord*, *C.J.C.*, 138 Wn.2d at 720-23.

//

Plaintiff argues that Defendants were aware of the potential for inappropriate sexual behavior because of the history of several priests having engaged in inappropriate sexual behavior over the decades preceding July 29, 1999.[1]  Given this history, and given the acknowledged responsibility toward the youthful parishioners, Plaintiff argues that Ramirez's crime against John Doe was a foreseeable harm requiring Defendants to protect the youth of the parish from Ramirez, therefore, Defendants were negligent in failing to conduct a proper vetting of him and also negligent for failing to properly supervise him.  This is an effort to avoid the general rule stated in *Niece* that one is not liable for the criminal acts of a third party unless one or both of the special relationship exist. *Niece*, 131 Wn.2d at 48.  Neither of those special relationships exists here.  Certainly, in a special protective relation involving a vulnerable person in the care and custody of a defendant, foreseeability of the crime limits liability, and is a question for the jury unless it is legally unforeseeable.  *Id.* at 51; *N.K.,* 175 Wn. App. at 530.  The Court has found that there was no such relationship between Defendants and John Doe; John Doe was not a vulnerable person in the care or custody of Defendants.  Accordingly, the Court concludes as a matter of law that Defendants did not owe a duty to John Doe.

The Court understands Plaintiff to also try to establish liability by establishing a *Niece* special relationship between

---

[1] On this same date, the Supreme Court of Washington issued its decision in *C.J.C. v. Corporation of Catholic Bishop of Yakima,* 138 Wn.2d 699 (1999), dealing in part with the alleged sexually inappropriate behavior of Fr. Scully and Fr. Calhoun of the Diocese.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 29

Defendants and Ramirez.   That is, Defendants would have known that Ramirez posed a risk of harm to youth if they had followed their standards for vetting him before allowing him to become a deacon and if they had properly supervised him.   In support, Plaintiff offered the testimony of Mr. Sipe.   Mr. Sipe is knowledgeable about the general responsibilities of church entities, such as Defendants, with regard to criminal sexual misconduct.   He testified that the eight-month period of seminary here was too short a period to then admit Ramirez as a Deacon, that the National Conference of Catholic Bishops in the early 1990s had published a study regarding the problem of sexual misconduct in the Church that was sent to all Bishops, that the absence of a psychological exam in Defendants' records was a violation of the standards for approving a person to become a Deacon, and generally, that Defendants failed to properly supervise Ramirez.   He acknowledged that he is unfamiliar with standards of Mexican seminaries and Orders, he did not know the standards in effect in many Dioceses, and finally, the e-mail correspondence from the Hijos Order about Ramirez could mean many things.

        First, the Court has found that there is no evidence or reasonable inference from the evidence admitted that Ramirez posed a risk of criminal sexual conduct or even inappropriate sexual conduct. Accordingly, even assuming Defendants had a duty, there is no admitted evidence to prove even a possibility, let alone probability, that Defendants knew or reasonably should have known that Ramirez posed a risk of any misconduct, and certainly not criminal sexual conduct. Second, Ramirez engaged in criminal sexual conduct on July 29, 1999.

As such, the *Niece* general rule applies.  Third, the claim of failure to supervise is subsumed in the claim of negligence.  "The same evidence that would establish [Defendants'] negligence under a broad theory of negligent supervision will also establish [their] negligence in failing to protect [John Doe] from all foreseeable harm." *Niece*, 131 Wn.2d at 52.  Assuming *arguendo*, that the claim of negligent supervision is not subsumed, the Court finds that Plaintiff failed to prove it by a preponderance of the evidence.  Defendants properly supervised Ramirez.  There is simply no evidence that either Defendant knew of any indication that Ramirez had engaged in any misconduct, let alone sexual misconduct.  Further, Ramirez was on his days off, miles from his assigned parish, visiting friends, and used the parish trailer without permission of either Defendant.  While the Court listened to the testimony of Mr. Sipe on this issue of negligent supervision, the Court rejects his opinion on this issue as unfounded given the admitted evidence.  Ramirez had successfully completed Seminary in Mexico, successfully completed Seminary in the Diocese, with no report of misconduct of any kind, and was in his early thirties, on his days off, and miles from his assigned church visiting friends.  During his assignment in both Zillah and Wenatchee, the Court finds he was properly supervised.  Accordingly, the Court finds Defendants did not fail to properly supervise Ramirez and concludes that to the extent that the Court's dismissal of the negligence claim did not also include the subsumed claim of negligent supervision, it is dismissed for failure of the Plaintiff to prove it.

//

**D.    NIED**

In the Order Denying Summary Judgment, ECF No. 70, the Court pointed out that Defendants had only challenged the Negligent Infliction of Emotion Distress claim on the basis that it was subsumed in, or barred by, the negligence claim.  As the Court pointed out, Defendants did not "challenge the quantum of evidence supporting Plaintiff's purported damages; they only assert that the damage claims are duplicative. . . .  Absent further argument from Defendants about the quantum of evidence supporting such damages, the Court finds no basis at this time upon which to grant summary judgment for Defendants on Plaintiff's NIED claim."  ECF No. 70 at 20.

Defendants did not file another summary judgment motion on this issue.  After completion of Plaintiff's case, Defendants did file a Rule 52(c) motion challenging Plaintiff's entire case.  ECF No. 131 at 8.  In essence, as to the NIED claim, Defendants argue there is no case holding that behavior of the Diocese following the July 29, 1999 incident creates a duty, that the duty was breached, and caused damages.  Plaintiff merely responded with a sentence citing to his opposition to the Motion for Summary Judgment, ECF No. 27, mentioned above.  ECF No. 141.  In that opposition, Plaintiff cited to no case supporting his NIED claim; rather, he simply argued that the NIED claim was not subsumed by his negligence claim.  ECF No. 27 at 19.

The Court finds there is no evidence in this case that Defendants engaged in any conduct which could support a NIED claim. Plaintiff has not cited to any case in support of his NIED claim, let alone one which establishes a duty and breach based on conduct similar

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 32

1   to that of Defendants here.  Plaintiff simply failed to prove an NIED
2   claim, and therefore, it is dismissed.

3   **E.    Damages**

4        As the Court has found that Plaintiff failed to prove any of his
5   claims, the Court need not reach the issue of damages.

6                            **V.    ORDER**

7        Accordingly, **IT IS HEREBY ORDERED:**

8        1.   Plaintiff's oral motion for a spoliation inference is
9             **DENIED.**

10       2.   Defendants' Motion for Judgment on Partial Findings, **ECF**
11            **Nos. 131 & 136**, is **GRANTED IN PART** (NIED, failure to show
12            special relationship or existence of a duty, failure to
13            show a breach), **DENIED IN PART** (statutes of limitations)
14            **AND DENIED AS MOOT IN PART** (segregation of damages).

15       3.   Plaintiff's negligence and negligent supervision claims are
16            hereby **DISMISSED WITH PREJUDICE.**

17       4.   Plaintiff's negligent infliction of emotional distress
18            claim is hereby **DISMISSED WITH PREJUDICE.**

19       5.   The Clerk's Office is directed to enter **JUDGMENT** in
20            Defendants' favor with prejudice.

21       6.   All pending deadlines and hearings are **STRICKEN.**

22       7.   The Clerk's Office shall **CLOSE** this file.

23   //
24   //
25   //
26   /

1        **IT IS SO ORDERED.**   The Clerk's Office is directed to enter the

2   Court's Findings of Fact, Conclusions of Law, and Order, and provide a

3   copy to all counsel.

4        **DATED** this  12th   day of June 2014.

5

6                          s/Edward F. Shea
                          _____
                           EDWARD F. SHEA
7                 Senior United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26